## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ALESHIA TINA HOUSTON, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.: CV 02-P-1650-S |
| | } | |
| ST. VINCENT'S HOSPITAL, | } | |
| | } | |
| Defendant. | } | |
| | } | |

**ENTERED**
**AUG 2 3 2004**

### MEMORANDUM OPINION

The court has before it Defendant's Motion for Summary Judgment (Doc. # 33) filed April 14, 2003. The motion is fully briefed and was under submission, without oral argument, as of August 13, 2004. (Doc. # 64). Plaintiff Aleshia Tina Houston's complaint against St. Vincent's Hospital ("St. Vincent's") asserts claims under Title VII and 42 U.S.C. § 1981 for disparate treatment and hostile environment race discrimination.[1] For the reasons outlined below, Defendant's Motion for Summary Judgment is due to be granted because there are no disputed issues of material fact and Defendant has demonstrated that it is entitled to judgment as a matter of law.

**I.    Legal Standards for Evaluating a Summary Judgment Motion**

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick*

---

[1] Houston's retaliation claims were dismissed by Order dated April 7, 2003, and her disparate treatment and hostile environment claims are limited to conduct that occurred from August 2000 until June 2001 while she worked as an ORA in Main Surgery and as a Scrub Technician in Outpatient Surgery. (Joint Status Report, § A).



*v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742, 2747-48 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817 (1973); *Texas Dept. of Community Affairs v. Burdine*, 101 S. Ct. 1089 (1981), as modified by *Desert Palace v. Costa*, 123 S. Ct. 2148 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment

---

[2] Here, Plaintiff has presented only circumstantial evidence of discrimination. (Doc. # 50, at 5-6).

action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 93 S. Ct. at 1824-25; *Burdine*, 101 S. Ct. at 1093-94; *Desert Palace*, 123 S. Ct. at 2154-55.

## II.   Relevant Undisputed Facts[3]

### A.   St. Vincent's Associate Handbook

Houston has been employed by St. Vincent's in various jobs since 1978. (Houston Depo. p. 10). She received and read a copy of St. Vincent's Personnel Handbook which contains a summary of the Hospital's policies on Equal Employment Opportunity, Harassment, Job Transfers and the Grievance Procedure. (Houston Depo. p. 145-46, Ex. 2; Makosky Dec. ¶¶ 4-7 , Exs. 1-4). St. Vincent's has pledged to "provide[] equal opportunity without regard to race." (Makosky Dec. ¶ 4, Ex. 1). Employees "are urged to inform the Personnel Department of any perceived violation of this policy." (*Id.*)  St. Vincent's Harassment policy prohibits "unwelcome conduct of a nature which causes an intimidating, hostile, or offensive working environment or unreasonably interferes with an individual's work performance." (Makosky Dec. ¶ 5, Ex. 2).  The Harassment provision in the Personnel Handbook encourages employees who are victims of harassment to "immediately report the incident to his or her supervisor, to the next higher level manager, or to Personnel." (*Id.*).

St. Vincent's also employs a formal Grievance Procedure which may be invoked by any employee. (Makosky Dec. ¶ 7, Ex. 4).  "A grievance shall be considered to be any complaint or dissatisfaction arising from an interpretation, application, or claimed violation of any provisions of St. Vincent's policies, rules or regulations, including discipline and termination of employment."

---

[3] If facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

(*Id.*).  Plaintiff testified that she reported all grievances to her supervisor and her personnel representative, (Houston Depo. p. 32, 37, 80, 173-177; Makosky Depo. p. 11, 21, 27, 40), although Plaintiff never formally invoked the Hospital's Grievance Procedure. (Makosky Dec. ¶¶ 2, 7, Ex. 4).

**B.     Plaintiff's Position as Operating Room Assistant (August 2000-January 2001)**

In August 2000, Houston voluntarily transferred from the Emergency Department to Main Surgery as an Operating Room Assistant ("ORA"). (Houston Depo. p. 146-47; Ex. 3).  Plaintiff asserts that she first experienced race discrimination during her tenure in Surgery. (Houston Depo. p. 16; Joint Status Report). In Main Surgery, Pat O'Fallon was the Operating Room Manager and Plaintiff's direct supervisor (Houston Depo. p. 19; O'Fallon Depo. p. 6-7), and Sherry Wininger was the Director of Surgical Services.  (Complaint ¶13; Wininger Depo. p. 7).   While working as an ORA, Houston alleges that she was treated differently because she is white by two African American coworkers - Catherine King[4] and Vanessa Jones.[5]  (Houston Depo. p. 27, 22, 52, 58).

**1.     Catherine King.**

First, Plaintiff complains that King introduced her as "the one who can go anywhere she wants." (Houston Depo. p. 57).  Plaintiff believes that King treated her differently "(b)ecause I

_____

[4]  Although Plaintiff identifies this person only as "Katherine," Defendant clarifies that Plaintiff is referring to Catherine King, who has been employed as an ORA by St. Vincent's since May 20, 1991. (Makosky Dec. ¶ 3). Although Houston believed that Catherine was the Team Leader of the ORAs, (Houston Depo. p. 51- 52), the undisputed evidence indicates that Catherine did not set Houston's work schedule (Houston Depo. p. 57), and had no authority to change Houston's rate of pay or job duties, or to discipline or discharge Houston.  (Makosky Dec. ¶ 3).  Moreover, there is no dispute that all of the harassment complained about in this case allegedly was perpetuated by coworkers.  (Joint Status Report).

[5] Jones is the only ORA identified in the Complaint as having discriminated against Houston because of her race. (Complaint ¶18). Jones has worked as an ORA at St. Vincent's since 1992. (Jones Depo. p. 61-71).

wasn't the right person that they – I think that they wanted a friend of hers to be hired, and she wasn't. And so Ms. O'Fallon hired me." (Houston Depo. p. 57).[6] Shortly after Plaintiff transferred into Main Surgery, King "made the statement some people can get the job instead of another person." (Houston Depo. p. 55). Houston asked King not to make such comments and they "never had any other words." (Houston Depo. p. 56-57). King never made any reference to Houston's race. (Houston Depo. p. 56).

### 2. Vanessa Jones.

Plaintiff also claims that Vanessa Jones treated her differently because of her race. A short time after her transfer to Main Surgery, Plaintiff allowed a relative of a patient into the pre-op holding area and Jones became upset, told Plaintiff that was not allowed, grabbed Plaintiff by the arm, pulled her out of the room and, later in the same shift, grabbed her arm again and backed her up against a glass wall in Main Surgery. (Houston Depo. p. 29-30, 58-63; Porterfield Depo. p. 10-11).[7] Jones made no reference to Houston's race. (Houston Depo. p. 62, 65). Houston reported Jones' conduct to O'Fallon and Jones received verbally counseling. (O'Fallon Depo. p. 12 -13). Jones never touched Houston again, although she followed Plaintiff around and made non-racial "stupid" remarks to her. (Houston Depo. p. 63-64, 68-70).

---

[6] Houston does not know who else applied for this job (Houston Depo. p. 54), but O'Fallon told her the other applicant was black. (Houston Depo. p. 54-55).

[7] Jones admits touching Houston on the arm to get her attention (Jones Depo. p. 10 -11), but she denies ever grabbing Houston.  (Jones Depo. p. 14-15). For the purposes of summary judgment, however, the court is required to assume as true Plaintiff's version of the facts.

Plaintiff complains that Jones referred to Houston as a "white butterfly." (Houston Depo. p. 70-71). Cynthia Moore[8] and Jones were sitting in front of the glass wall in the Surgery Department when they said the following about Plaintiff: "Look at that white butterfly. She is always cleaning. Cleaning, cleaning, cleaning." (Houston Depo. p. 71). Jones called Plaintiff a "white butterfly" four to six times (Houston Depo. p. 77), and Cynthia said it everyday. (Houston Depo. p. 77). Plaintiff was offended at the comments (Houston Depo. p. 77), although they did not interfere with her work. (Houston Depo. p. 78). Other the "white butterfly" comment, Plaintiff does not complain about any other allegedly racial remarks during her tenure as an ORA. (Houston Depo. p. 78).

### 3.   Plaintiff's Complaints.

Houston reported the conduct of her coworkers to O'Fallon (Houston Depo. p. 78-79), although O'Fallon does not recall that Plaintiff complained about race or racially inappropriate remarks. (O'Fallon Depo. p. 10-15, Ex. 1).[9] O'Fallon recalls Houston reporting concerns with coworkers to her on three or four occasions, including the incident with Jones, at which time O'Fallon reported the situation to Sherry Wininger and contacted the Personnel Department. (O'Fallon Depo. p. 15; Wininger Depo. p. 20 -21).

On Thursday, November 30, 2000, Houston met with Personnel Manager Julie Makosky, who took notes. (Houston Depo. p. 79-80; Makosky Depo p. 11, Ex. 1; Makosky Dec. ¶ 8, Ex. 5).

---

[8] At her deposition, Plaintiff did not identify Moore as someone who treated her differently because of her race, (Houston Depo. p. 58), although she appears to assert that claim for the first time in her opposition brief. (Doc. # 50, at 2-3).

[9] Plaintiff testified that O'Fallon had accurately described their discussions. (Houston Depo. p.164).

Houston told Makosky "everything that was going on." (Houston Depo. p. 80). Makosky's notes indicate Plaintiff complained that her co-workers were jealous and unfair, and although she did not report race as an issue, she did mention a "butterfly" comment. (Makosky Depo. p. 171-81, Ex. 1).[10]

### 4.   Meetings with ORAs.

The next day, Makosky and O'Fallon held a meeting with the ORAs, except Houston. (Makosky Depo. p. 27, 128, Ex. 1). Makosky "shared with them some of [Houston's] concerns about things that had been going on [and that Houston] was feeling uncomfortable [and] wanted to be part of the team but was feeling like they were giving her a hard time." (Makosky Depo. p. 18 - 19). The ORAs stated that they felt like Houston "didn't want them to correct her or to show her the correct way to do things." (Makosky Depo. p. 19).[11] O'Fallon believed that Houston's coworkers did not like her because she was working harder than they were and was making them look lazy. (O'Fallon Depo. p. 40).

The following Monday, December 4, 2000, Makosky, O'Fallon, and Wininger held a joint meeting with all ORAs, including Houston.  (Makosky Depo. p. 21-24). During this meeting, Houston's coworkers stated that Houston messed up their fun and messed up a good thing, and accused Houston of "just trying to look good." (Houston Depo. p. 85-87)  Wininger told Houston that her coworkers were complaining because she "was showing them up and they did not like it, and they were jealous." (Houston Depo. p. 87). None of Plaintiff's coworkers made any reference to her

---

[10] Makosky's notes reflect that Houston was called "butterfly" because she was always moving around and doing something. (Makosky Depo. p. 18).

[11] "One of the things that really bugged them was time that was spent assisting one of the RNs . . . in the afternoon, getting paperwork ready for the next day, which was something she volunteered to do, and they were not aware that Pat had approved that, and we cleared that up." (Makosky Depo. p. 19-20).

race in the meeting. (Houston Depo. p. 87-88). However, Wininger said, "Yeah, y'all are black, Tina is white, but she doesn't get any privileges. She does the same job y'all do, but she does it and I don't have to ask her." (Houston Depo. p. 87-88). According to Plaintiff, Wininger told her on other occasions that this was a racial issue. (Houston Depo. p. 152-157).[12]

Following this meeting, and in an effort to diffuse the tension among the ORAs, Houston was laterally transferred as an ORA to Outpatient Surgery. (Houston Depo. p. 89) She retained the same pay, benefits, and job responsibilities. (Houston Depo. p. 89).

### C.    Plaintiff's Position as Scrub Technician (January 2001 - June 2001)

Houston worked as an ORA in Outpatient Surgery from December 2000 until January 2001, when Wininger promoted Houston to Scrub Technician, which included a pay increase and increased job responsibilities. (Houston Depo. p. 90-91). Houston reported to O'Fallon and Wininger. (Houston Depo. p. 19). Houston alleges that she was mistreated by her black Outpatient Surgery coworkers because of her race, including Sharon (LNU), Kim Glaze, and Yvette Foney. (Houston Depo. p. 34 -42).[13]

#### 1.    Sharon (LNU).

First, Plaintiff complains that Sharon made the following remark in early 2001 when Plaintiff was training as a Scrub Technician, "I don't like teaching you, I don't want to teach you, and I don't like them putting you in my room." (Houston Depo. p. 35, 95). Sharon never made any reference

---

[12] Wininger denies ever attributing these events to race. (Wininger Depo. p. 17-18). Neither Sheila Porterfield, Julie Makosky, or Pat O'Fallon ever heard Wininger say anything like this. (Porterfield Depo. p. 15; Makosky Depo p. 26 -27; O'Fallon Depo. p. 34). For the purposes of summary judgment, however, the court will assume as true Plaintiff's version of the facts.

[13] Kim Glaze is the only Outpatient Surgery employee identified in the Complaint and EEOC Charge as having discriminated against Plaintiff.

to Houston's race and, in spite of her comment, she did show Houston how to perform the procedure. (Houston Depo. p. 95-96).  Houston worked with Sharon "(m)aybe twice . . . ." (Houston Depo. p. 97).

### 2.     Kim Glaze.

Houston also complains about the treatment she received from Kim Glaze.[14] Houston believes that she "was barred by Kim Glaze from assisting on surgeries with Dr. Rader" (Houston Depo. p. 38-39, 98-100), although she never heard Glaze tell Dr. Rader to exclude Houston from the room. (Houston Depo. p. 99).  Houston does not believe Dr. Rader excluded her because of her race. (Houston Depo. p. 100).

In late March 2001, when Houston was sent to observe a surgical procedure being performed by Dr. Salter, Glaze said "No, you are going to do this case [as opposed to just observing] or you – you can do this case or get your ass down the hall and find something else to do." (Houston Depo. p. 35-36; Porterfield Ex. 2).   Houston participated in the procedure, although Glaze "took (Houston's) hand and she slammed it into hers quite a few times hollering at (Houston), saying, 'Put [the instrument] in his hand.'" (Houston Depo. p. 27, 36, 101-02).[15]  Patsy Booher, the Laser Coordinator for St. Vincent's was also part of the procedure and recalled that Glaze hit Houston on the back or side of the hand with an instrument, although she never grabbed her. (Booher Depo. p.

_____

[14] Kim Glaze has worked as a Scrub Technician at St. Vincent's for approximately 6 years. (Glaze Depo. p. 6).

[15] According to Glaze, a Scrub Technician must slap the instruments into a surgeon's hand so they can feel the instrument because the surgeon is paying attention to the patient, not the Scrub Technician. (Glaze Depo. p. 8-9).  In this case, she says she "was touching Tina's hand, not slapping it, you know, just showing her how to put it in a surgeon's hand." (Glaze Depo. p. 9).  Glaze denies popping Houston's hand hard enough to cause a bruise.  (Glaze Depo. p. 9 -10).  For the purposes of summary judgment, however, the court will assume as true Plaintiff's version of the facts.

6, 11-12). Glaze made no reference to Houston's race during this procedure. (Houston Depo. p. 102).

Upon completion of this surgical procedure, Booher, Houston, and Glaze all talked with Sheila Porterfield about these events. (Porterfield Depo. Ex. 2). Houston claimed that Glaze began hollering at her and called her a "crazy white bitch." (Houston Depo. p. 37 -38; p. 107 l-09). Glaze recalled a sedate conversation concerning what Houston needed to do to learn the Scrub Technician job. (Glaze Depo. p. 10-11). Porterfield described the meeting as follows: "A confrontation ensued without any positive results." (Porterfield Depo. Ex.2). Porterfield called Wininger to help resolve this situation, and Plaintiff told Wininger she planned to quit. (Porterfield Ex. 2; Houston Depo. p. 39-40). Wininger encouraged Plaintiff to stay and told her that she would take care of it. (Houston Depo. p. 39-40). Glaze denied to Wininger that she had hit Houston on the hand (Glaze Depo. p. 13), and Glaze's actions did not overly concern Wininger because "(t)hat's what we do, we pop instruments in the hand." (Wininger Depo. p. 33-34).

After the meeting, Porterfield separated Glaze and Houston, and Jackie Haley, a white employee, was assigned as Houston's preceptor for training purposes. (Porterfield Depo. Ex. 2; Houston Depo. p. 109-10). Plaintiff did not have any difficulty working with Haley, who "was nice to me. Very nice to me." (Houston Depo. p. 111). Nonetheless, Houston claims Haley began talking with Glaze and "went on the blacks' side." (Houston Depo. p. 111-12). Houston claims Haley's "whole attitude toward me kind of changed" after she began spending time around Glaze." (Houston Depo. p. 113 -14). Plaintiff has not made any specific allegations about Haley's behavior.

### 3.   Yvette Foney.

On May 23, 2001, Plaintiff participated in a surgical procedure with Dr. Gillis and Yvette

Foney. (Houston Depo. p. 115, 123; Porterfield Depo. Ex. 2). Houston set up her instruments on the table, left to scrub, and did not check her table when she returned to ensure all the instruments were still there. (Houston Depo. p. 41, 116, 119). During the procedure, Dr. Gillis asked for an item that Houston could not find; Houston believes Foney took the item off her table. (Houston Depo. p. 119-20).[16]  This was the last day that Houston worked as a Scrub Technician. (Houston Depo. p. 125).

Houston talked with Porterfield about what had occurred in the surgical procedure, to which Porterfield responded "you have got to suck it up and get on their side." (Houston Depo. p. 124-25).[17] Porterfield's notes reflect that Houston complained that Foney had set her up to fail and that she felt Dr. Gillis did not like her. (Porterfield Depo. Ex. 2).

The next day, Houston complained to Betty Williams, the former Vice President of Human Resources, who authorized her transfer to a different department. (Houston Depo. p. 125-26, 170). Makosky recalls that this meeting was scheduled by Plaintiff and that Williams invited Personnel to participate. (Makosky Depo. p. 40-41). Makosky's notes reflect that Houston repeated the same concerns she had previously outlined concerning her coworkers, although she expressed this time that she felt the trouble was racially motivated. (Makosky Depo. Ex. 1). Makosky asked Houston

---

[16] When Houston left the operating room after the procedure, she claims she heard Foney say, "I got her." (Houston Depo. p. 121-22). Houston assumes they were talking about the missing instrument, but she did not hear anyone make any specific reference to Dr. Gillis, to her, or to the surgical procedure. (Houston Depo. p. 123).

[17] Porterfield's notes state that she "encouraged Tina to evaluate what she is trying to accomplish." (Porterfield Depo. Ex. 2).

if there were any new events, and she said no. (Makosky Depo. p. 41-42).[18]

On May 27, 2001, Houston submitted a job bid for a lower-paying position in Orthopedics (Houston Depo. Ex. 3), and on June 4, 2001, she received a transfer to Orthopedics. (Complaint ¶47). Plaintiff enjoyed her work as a Scrub Technician and was saddened to leave the position, although no one at St. Vincent's required her to transfer to Orthopedics – Plaintiff "did it more myself so I wouldn't go bad." (Houston Depo. p. 50, 170). Later Plaintiff transferred back to the Emergency Department, where she presently works. (Houston Depo. p 12.)

### D.    Plaintiff's Allegations

On June 15, 2001, Houston filed her Charge of Discrimination with the EEOC alleging that she was "being harassed and treated differently because of (her) race."(Houston Depo. p. 149,152; Ex. 4). Her EEOC charge accuses Vanessa Jones and Kim Glaze, both black, of harassing her and making her work environment hostile. (Houston Ex. 4). Houston's charge also alleges that Wininger told her "that this is a race issue." (*Id.*). On July 3, 2002, Plaintiff filed this lawsuit.

## III.    Applicable Substantive Law and Discussion

As a threshold matter, Plaintiff's claims in this case are asserted under both Title VII and § 1981. Defendant asserts that Plaintiff waived her § 1981 claims because she did not address them in her opposition to summary judgment. (Doc. 52). Plaintiff maintains that her failure to argue those claims was "merely oversight" and that "by failing to specifically and separately argue in identical terms her §1981 claims, the Plaintiff has neither conceded nor waived them." (Doc. # 54). Setting

---

[18] Although Plaintiff's brief in opposition to summary judgment claims that there is a discrepancy between Makosky's deposition testimony and Makosky's notes from the meeting, (Doc. # 50, at 3), Plaintiff does not provide a specific cite to the record in support of the alleged discrepancy.

aside the semantics of whether Plaintiff mentioned § 1981 in her opposition brief, the court assumes that Plaintiff's § 1981 claims are still in the case because both statutes utilize the same analytical framework and requirements of proof. *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Likewise, although Defendant makes a valid argument that many of Plaintiff's claims are time-barred, the court will assume that all of Plaintiff's claims in this case are timely and properly before the court.

### A.    Hostile Environment in the Form of Racial Harassment

In order to establish a prima facie case of hostile environment in the form of racial harassment, Plaintiff must demonstrate: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a racially abusive work environment; and (5) a basis for holding the employer liable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

A prima facie showing of a hostile work environment arises only where the racial harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (citation omitted). The standard is "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citation omitted). For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment. *Faragher*, 524 U.S. at 788. Furthermore, in order to be actionable under the statute, the work environment must be offensive on

13

both an objective[19] and a subjective level. That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. This is a question to be determined with regard to the totality of the circumstances. *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

The Eleventh Circuit has specified the following factors to consider in determining whether an environment is hostile: (1) the frequency of the discriminatory conduct, (2) the severity of the discriminatory conduct, (3) whether the conduct is threatening or humiliating or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the plaintiff's performance at work. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

### 1. Plaintiff Has Not Demonstrated the Existence of a Hostile Environment.

The undisputed facts in this case indicate that the work atmosphere was neither "charged with racial hostility" nor abusive. *Edwards*, 49 F.3d at 1521. The Supreme Court has repeatedly emphasized that this cause of action is limited to extreme work conditions. *See, e.g., Faragher*, 524 U.S. at 788; *Oncale*, 523 U.S. at 81.

The alleged harassment of Plaintiff occurred during two distinct time periods in two different departments at St. Vincent's (Main Surgery and Outpatient Surgery).[20] Accordingly, the court must

---

[19] The objective evaluation is based on a "reasonable person" standard. *Watkins v. Borden*, 105 F.3d 1344, 1355-56 (11th Cir. 1997) (affirming the use of the "reasonable person" standard in a hostile work environment claim where the plaintiff argued that the court should have applied a more contextual standard such as "a reasonable African-American person.")

[20] Houston alleges that Catherine King and Vanessa Jones treated her differently because of her race while she worked as an ORA in Main Surgery. (Houston Depo. p. 58). Thereafter, she was transferred as an ORA to a different area of the Surgery Department - Outpatient Surgery - where she had no problems with her coworkers, white or black until she was promoted to Scrub Technician.

consider these complaints to constitute two separate claims. Moreover, the majority of Plaintiff's complaints have nothing to do with race, *e.g.,* Catherine King's comments when Plaintiff was an ORA, and, after Plaintiff's promotion to Scrub Technician, Sharon (LNU)'s apparent dislike of Plaintiff, the Dr. Rader incident with Kim Glaze, and the alleged missing instrument situation with Yvette Foney.[21] Although the arm-grabbing incident with Vanessa Jones was arguably severe and threatening, it too was unrelated to Plaintiff's race. (Houston Depo. p. 62, 63-65, 68-70). Because Title VII does not regulate the "general civility" of employees, *see Faragher,* 524 U.S. at 788, conduct that may be counted as contributing to a hostile environment *must be of a race-related nature* and not "[i]nnocuous statements or conduct" that bear no relation to race, *see Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 583 (11th Cir. 2000).

The only race-related comments of which Plaintiff complains occurred in different departments at different times: (1) the "white butterfly" nickname used by Cynthia Moore and Jones when Plaintiff was an ORA, (Houston Depo. p. 71), and (2) one incident in which Glaze allegedly called Plaintiff a "crazy white bitch" when Plaintiff was a Scrub Technician. (Houston Depo. p. 37-38, 107).[22] One isolated comment by Glaze is not enough to support a hostile work environment

---

(Houston Depo. p. 89-91). Plaintiff alleges that, after she was promoted, she was again treated poorly by three different coworkers working in a different department than before - Sharon (LNU), Kim Glaze, and Yvette Foney. (Houston Depo. p. 34-42).

[21] Although Plaintiff's opposition brief also claims generally that "she was spoken to harshly on a regular basis," the only citation from the record Plaintiff provided for this assertion - page 24 of her deposition - does not support that statement. (Doc. # 50, at 1-3). Regardless, Plaintiff testified that she was yelled or screamed at on only two occasions in a ten month period – hardly "on a regular basis." (Houston Depo. p. 31, 37-38, 107-09). In any event, there is no evidence to indicate any harsh words were race-related.

[22] Plaintiff's opposition brief also includes allegations that are, by agreement of the parties, not part of this case. For example, Plaintiff alleges that "Diane/Diana/Debbie Brown" "accosted and

claim for Plaintiff's tenure in Outpatient Surgery. Moreover, even assuming that Moore called Plaintiff a "white butterfly" on a daily basis while Plaintiff worked in Main Surgery, that comment is not so "'overt and denigrating' and [] pervasive and shocking" to create an atmosphere charged with racial hostility. *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 (11th Cir. 1990). Plaintiff admits that it never interfered with her work. (Houston Depo. p. 78). On these facts, the record does not demonstrate that Plaintiff was exposed to sufficiently egregious conduct to support a hostile environment claim. In other words, summary judgment is appropriate because Plaintiff's allegations fall below the *Mendoza* line. *Mendoza*, 195 F.3d at 1247-48.

## 2.    Defendant is Entitled to the Affirmative Defense.

Even if Plaintiff could demonstrate that the work environment was sufficiently hostile, St. Vincent's nonetheless would be entitled to an affirmative defense against liability. *Faragher*, 524 U.S. at 807; *Pennsylvania State Police v. Suders*, 2004 WL 1300153, at *2 (U.S. June 14, 2004).[23] The affirmative defense requires Defendant to prove "that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *and* that Plaintiff unreasonably failed to take advantage of those preventive or corrective opportunities *or* that Defendant responded by taking reasonable corrective action after Plaintiff took advantage of the preventive or corrective

---

accused [Plaintiff] of inappropriately leaving a patient on a bedpan" and called Plaintiff a "crazy white bitch" and a "short, white, blond-headed bitch." (Doc. # 50, at 2). The parties have agreed that Plaintiff's claims of discrimination in this case begin with her August 2000 transfer from the Emergency Department to Main Surgery. (Houston Depo. p. 16; Joint Status Report). The undisputed evidence indicates that these incidents occurred during Plaintiff's earlier tenure in the Emergency Department, (Houston Depo. p. 47, 29, 138-140), outside the realm of the parties' agreed-upon scope of the case.

[23] It is undisputed that all of the alleged perpetrators of the discriminatory conduct are coworkers in this case, (Joint Status Report, at 6), and therefore the affirmative defense is unquestionably available to Defendant.

opportunities provided by defendant. *Faragher*, 524 U.S. at 807.

The undisputed facts indicate that Plaintiff first complained to O'Fallon about the Jones incident, and that O'Fallon verbally counseled Jones. (Houston Depo. p. 63-64, 68-70; O'Fallon Depo. p. 12 -13). When Plaintiff later approached O'Fallon with concerns about other coworkers, O'Fallon went to the Director of Surgical Services, who referred Plaintiff to Makosky in Personnel. (O'Fallon Depo. p. 15; Wininger Depo. p. 20-21). Plaintiff met with Makosky, and then Makosky called two meetings of the ORAs to address her concerns. (Makosky Depo p. 21, 22, 27, 128; Ex. 1). Thereafter, in an effort to diffuse the tension among the ORAs, Houston was laterally transferred to Outpatient Surgery where Houston had no further problems with her fellow ORAs. (Houston Depo. p. 89). After Plaintiff was promoted to Scrub Technician, she had a problem with Glaze and, immediately upon reporting the problem, Defendant separated the two women and no further problems were reported. (Porterfield Depo. Ex. 2; Houston Depo. p. 109-10). The undisputed facts demonstrate that Defendant is entitled to the affirmative defense because Defendant promptly and appropriately responded with corrective action to Plaintiff's concerns. For this alternative reason, summary judgment on this claim is appropriate.

When all factual disputes and justifiable inferences are resolved in favor of Plaintiff, the court finds that the Plaintiff has failed to adduce sufficient evidence on her hostile environment claim to create questions of fact for the jury and that Defendant has demonstrated that it is due judgment as a matter of law.

### B.    Disparate Treatment on the Basis of Race

To establish a prima facie case of disparate treatment, Plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her

17

employer treated similarly situated [non-white] employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Construing the Rule 56 evidence in the light most favorable to Plaintiff, the court finds that Plaintiff has failed to establish a prima facie case because she has not shown that she suffered an adverse employment action.

Plaintiff claims that she was treated differently because of her race because she "was not able, due to the mistreatment by her coworkers and the acquiescence of her employer, to continue as a scrub tech []." (Doc. # 50, at 5). Plaintiff further explains her disparate treatment claim as follows: "rather than disciplining the Plaintiff's offending coworkers in any meaningful way, [Defendant] moved the Plaintiff around the hospital, allowed the offenders to continue their behavior, forcing the Plaintiff to transfer to another area of the hospital and to accept lower pay, thereby depriving the Plaintiff of the opportunity to excel in a position which the Plaintiff testified she enjoyed." (Doc. # 50, at 5). The record is devoid of any evidence that Plaintiff received any discipline, and therefore Plaintiff cannot claim that, because of her race she was punished while African-American employees were not so disciplined. Accordingly, it appears to the court that Plaintiff's only claim is that she was "forc[ed] to transfer [out of her Scrub Technician position] to another area of the hospital and to accept lower pay."[24]

---

[24] Two other job changes took place during the relevant time period for this case, although neither of those actions were adverse. First, Defendant transferred Plaintiff in December 2000 - without any change in pay, benefits, or job responsibilities - from an ORA job in Main Surgery to the same position in Outpatient Surgery to diffuse the tension between Houston and her fellow ORAs. (Houston Depo. p. 89). The transfer ended Plaintiff's complaints about harassment from coworkers in Main Surgery. (Houston Depo. p. 89). About a month after the transfer in January 2001, Houston was promoted to the Scrub Technician position. (Houston Depo. p. 90-91). It is clear that neither of these job changes can serve as the basis for Plaintiff's claim given that neither her lateral transfer nor her promotion constitute an adverse employment action. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

The undisputed facts indicate that, after an incident during a surgical procedure upset Plaintiff, she complained to the Vice President of Human Resources, who authorized Plaintiff's transfer to a different department. (Houston Depo. p. 125-26, 170). On May 27, 2001, Plaintiff submitted a job bid for a lower-paying position in Orthopedics (Houston Depo. Ex. 3), and received the position on June 4, 2001. (Complaint ¶ 47). It is undisputed that no one at St. Vincent's required Plaintiff to transfer out of her Scrub Technician position. (Houston Depo. p. 50, 170). Nor does Plaintiff allege that Defendant forced her to transfer into that particular lower-paying position; in fact, the undisputed evidence indicates that Plaintiff voluntarily bid on the Orthopedics position. Rather, Plaintiff implies that she was forced to transfer to get away from the treatment she was receiving from some of her fellow Scrub Technicians (*i.e.*, that she was constructively transferred). (Doc. # 50, at 5-6).

"The threshold for establishing constructive [transfer] . . . is quite high." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001). "[A] plaintiff must demonstrate that working conditions were 'so intolerable that a responsible person in [her] position would have been compelled to [transfer].'" *Hipp*, 252 F.3d at 1231 (citations omitted). Plaintiff's subjective feelings about her employer's actions are not considered; rather, the court considers whether a *reasonable person* in the Plaintiff's position would be compelled to transfer. *Doe v. DeKalb Co. Sch. Dist.*, 145 F. 3d 1441, 1450 (11th Cir. 1998). In order to sustain such a claim, there must be "a high degree of deterioration in an employee's working conditions." *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991). Moreover, the standard for proving constructive transfer is *higher* than the standard for proving a hostile work environment. *Hipp*, 252 F.3d at 1231.

19

For the same reasons Plaintiff's hostile environment claims fail, Plaintiff cannot show that her working conditions as a Scrub Technician from January 2001 to June 2001 were so severe that she was compelled to transfer. Plaintiff identified only three upsetting events which occurred during the six months she worked as a Scrub Technician – one in January 2001, one in March, and the last on May 23, 2001. Only one of those events was even arguably related to race - the comment made by Glaze in March 2001 - and after the comment was made, Plaintiff was relieved of working with Glaze and experienced no further problems with her. Although Plaintiff's working conditions may have been subjectively unpleasant, the record does not support the high degree of deterioration necessary to demonstrate that a reasonable person would have been forced to transfer in the same conditions. Accordingly, summary judgment is appropriate on this claim because Plaintiff has failed to demonstrate that she suffered an adverse action to meet her prima facie burden.[25]

### IV.    Conclusion

For the reasons stated above, Defendant's motion for summary judgment is due to be granted. The court finds that no genuine issues of material fact remain for trial and that Defendant is entitled to judgment as a matter of law. A separate Final Judgment will be entered.

---

[25] The court also finds that Plaintiff's prima facie case fails because she has not identified any similarly situated African- American employees who were treated more favorably than Plaintiff. *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998). Plaintiff claims that she has "shown that numerous black coworkers were allowed to interfere with her work with no disciplinary repercussions . . . [and that] her superiors did not take any meaningful disciplinary action against her black coworkers forcing the Plaintiff, ultimately, to transfer to another department and a lower paying job." (Doc. # 50, at 6). Plaintiff's dissatisfaction with the discipline given to her coworkers is not relevant to her claim of disparate treatment. Plaintiff does not claim that she was disciplined when black employees were not. She claims that she was forced to transfer to a different position. In the absence of any evidence that the Hospital treated Plaintiff less favorably than her coworkers for engaging in the same conduct, Plaintiff's disparate treatment claim fails.

**DONE** and **ORDERED** this ___23rd___ day of August, 2004.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE